IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CR3030 |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| CHARLES M. MCMILLIN, | ) | |
| | ) | |
| Defendant. | ) | |

 

The defendant has moved to suppress "any and all evidence seized from the defendant and the defendant's vehicle," and "any statements obtained from the defendant by law enforcement" on January 8, 2008.  Filing No. 23.  The defendant claims that following a traffic stop, his vehicle was unlawfully searched without defendant's consent, a warrant, or probable cause.   Defendant also claims he was not advised of his Miranda rights before being subjected to custodial interrogation following the traffic stop, and his responsive statements must therefore be suppressed under the Fifth Amendment.[1]   For the reasons discussed below, the defendant's motion to suppress will be denied.

---

[1]The defendant's motion references a Sixth Amendment claim, but his brief does not mention the Sixth Amendment.  Further, based on the evidence of record, the defendant is not moving to suppress any evidence obtained after judicial proceedings were initiated against him.   Brewer v. Williams,430 U.S. 387, 398 (1977). Defendant's Sixth Amendment claim is deemed abandoned.

## FINDINGS OF FACT

The evidentiary hearing on defendant's motion to suppress was held before Magistrate Judge Piester on April 22, 2009, and was fully submitted on May 22, 2009. Judge Piester has not filed a report and recommendation on defendant's motion, and he is unable to do so at this time. After conferring with counsel on June 24, 2009, and with their approval, defendant's motion to suppress will be resolved by me based on the record developed before Magistrate Judge Piester.   The following sets forth my factual findings based on that record.

At approximately 1:00 p.m. on January 7, 2008, Nebraska State Patrol Troopers Bryan Henrichs, David Frye, and Dale Fellin were each seated in their respective patrol vehicles and parked adjacent to one another in the interstate median near mile marker 404 on Interstate 80, between the 27th and 56th Street exits for Lincoln Nebraska. Trooper Fellin, a canine officer, was driving a pickup or SUV and had his canine with him in his vehicle. The weather was sunny but cold, and although the ditches contained some snow, there was no precipitation on the roadway itself.

As the troopers were monitoring both the eastbound and westbound interstate traffic, Troopers Henrichs and Frye noticed a red Dodge minivan traveling eastbound in the right lane. See exs. 101, 102 & 103. The van visibly slowed as it approached the officers' location, and the defendant maintained eye contact with the officers as he passed. Based on the vehicle's appearance, Trooper Henrichs believed the minivan was a rental vehicle. Minivans cost substantially more to rent, and are therefore typically rented to transport either cargo or people, yet the defendant's van contained no visible cargo or passengers. Trooper Henrichs stated to Trooper Frye, "Did you see that," and then left the median and followed defendant's van, activating his in-car camera as he entered the interstate roadway. The in-car camera, along with the

microphone on the Trooper Henrich's belt, recorded the events immediately prior to and during his encounter with the defendant on January 8, 2009. See exs. 1 & 2.[2]

While following the defendant's vehicle, Trooper Henrichs observed the vehicle following too closely behind a semi truck and traveling in excess of the posted speed limit. Trooper Henrichs initiated a traffic stop.

The defendant's vehicle stopped on the shoulder of the interstate. Trooper Henrichs parked behind the van, exited his patrol vehicle, and approached the passenger side of the van. As he walked past the rear of the vehicle, Trooper Henrichs looked through the van windows. The officer saw what appeared to be boxes located between the middle and rear seat, and behind the rear seat. Those in the rear cargo

---

[2]Exhibits 1 and 2 contain identical video recordings of the traffic stop. However, the exhibit 1 videotape has a clearer audio recording of the defendant's communications with Trooper Henrichs during the traffic stop, and exhibit 2 more clearly records the defendant's conversation with Trooper Frye after the stop was completed.

area appeared to be covered by a blanket.[3] Trooper Henrichs saw no luggage in the van.

When Trooper Henrichs reached the passenger window, the window was already open. The officer leaned toward the window so he could speak with and hear the defendant. He did not stick his head through the window. Trooper Hendrichs asked the defendant to provide his driver's licence, vehicle registration, and proof of insurance. While speaking with the defendant, the officer smelled marijuana. He also noticed the ignition keys had a bar-code, and the dashboard had a "No Smoking" placard, both of which confirmed he officer's belief that the van was a rental vehicle. As the defendant produced his driver's license, Officer Henrichs noticed defendant's hand was visibly shaking. The officer also noticed the defendant was wearing a T-shirt with an "NYPD" logo. See ex. 5. The defendant produced a registration, but not for a rental vehicle. The defendant never produced an insurance card.

---

[3]The defendant claims the van windows were too dark to afford a passing view inside the van as the officer walked by, (see exs. 101 & 102), and therefore the officer must have placed his head inside the van through the passenger window, without probable cause, while speaking to the defendant at the side of the van. Based on the photographs and videotapes of record, as well as the officer's testimony, the defendant's claim is highly unlikely. The videotape of the stop confirms that Trooper Henrichs asked the defendant about boxes in the vehicle while he was completing a warning ticket and seated with the defendant in the patrol vehicle. As confirmed by the photographs of the vehicle, any boxes in the rear cargo area could not have been seen from the front passenger side window area, and it is highly unlikely the box between the middle and rear seat could have been viewed from this vantage point. See exs. 3, 4, 6, 104, & 105. I therefore credit the officer's testimony, corroborated by the testimony of Trooper Frye, that Trooper Henrichs was able to see through the minivan windows as he walked by, and when he did so, he saw boxes or apparent boxes in the van, including what appeared to be boxes covered by a blanket in the van's rear cargo area.

Officer Henrichs told the defendant he was stopped for following too closely and  asked the defendant to sit in the officer's patrol vehicle.  As the defendant was exiting the vehicle, Trooper Henrichs took off his wide-brimmed State Patrol hat so he could lean closer to the passenger window without dislodging the hat.  As he commonly does when he suspects a driver is intoxicated, the trooper placed his nose near the upper edge of the passenger window.  He smelled the distinct odor of marijuana and stated so aloud, thereby recording the finding with his in-car video equipment.

Inside the cruiser, while preparing the warning ticket, Trooper Henrichs again explained the defendant was stopped for following too closely and speeding.  The officer asked about the origin, destination, and purpose of defendant's trip.  The defendant stated he was traveling from Denver to Chicago, a sixteen-hour drive, and was returning from a three-day ski trip in Vail, Colorado.  The defendant explained he left Chicago the morning of January 3, 2008, apparently skied January 4, 5, and 6, and was returning to Chicago on January 7, 2008.  The officer observed the defendant had no sunburn from his three days of skiing.

The officer asked the defendant about his past ski trips.  The defendant responded he skis a few times a year, and last skied at the Powderhorn ski resort near Durango, Colorado. Trooper Henrichs was fairly certain the Powderhorn resort was actually located near Grand Junction, Colorado, approximately three hours north of Durango.

In response to the officer's questions, the defendant denied any past arrests, specifically denying any arrests for drug-related crimes.  Trooper Henrichs had contacted dispatch to check the defendant's driver's license and criminal history.  Dispatch reported the driver's license was valid, and the defendant had a positive criminal history for a drug-related crime.

-5-

Trooper Henrichs had not seen luggage in the van.  Since the defendant claimed to have skied for seven days, the officer expected to see seven days worth of clothing in the vehicle.  When asked if the defendant had any luggage and where it was located, the defendant responded that he did have a suitcase, and it was located by the back passenger-side sliding door of the van.  This luggage would not have been visible from the outside of the van when the door was closed.  See ex. 6.

The officer asked the defendant about the cardboard boxes between the seats.  When the officer asked this question, he was asking about the boxes located in the cargo area behind the rear seat.  See ex. 3.  However, the defendant believed the officer was asking about the box between the middle and rear seats, (see exs. 4 & 105), and explained the box contained a fryer or roaster the defendant had purchased for his girlfriend from an outlet store in Colorado.

During the course of the dialogue in the officer's patrol vehicle, Trooper Henrichs noticed the defendant was very nervous.  The pulse of his carotid artery was visible, and the defendant was sweating even though it was very cold outside and the heater was not on in the patrol vehicle.  The defendant failed to maintain eye contact with the officer and at times, hesitated before answering the officer's questions.

The officer gave the defendant a warning ticket, returned defendant's driver's license, and stated, "Okay.  Have a good day.  Thirteen minutes elapsed from the time the stop was initiated and the warning ticket was issued.  As the defendant began exiting the patrol vehicle, the officer asked if the defendant was willing to answer some questions.  The defendant returned to his seat and responded, without hesitation, "Yeh."  The officer again mentioned the box in the van and asked about the lack of luggage.  Trooper Henrichs explained that Interstate 80 is often used for illegal activity, including transporting drugs.  In response to Trooper Henrichs' questioning, the defendant denied having marijuana in the vehicle.  Trooper Henrichs asked the defendant to explain why the officer could smell marijuana.  The defendant stated he

did not know.  The officer explained that possessing a small amount of marijuana would result in only a fine, and again asked if the defendant had marijuana in the vehicle.  The defendant admitted he had smoked marijuana in the past and had  some marijuana, enough for personal use, in the van.   Upon further questioning, the defendant explained his marijuana was located near his luggage.

Trooper Henrichs asked for permission to search the vehicle.  The defendant offered to retrieve the marijuana and hand it to the officer. The officer asked again for consent to search.  The request was denied.  Trooper Henrichs advised the defendant that the van would nonetheless be searched based on probable cause.

Troopers Frye and Fellin had arrived at the scene during the course of the traffic stop.   Trooper Frye parked his vehicle behind Trooper Henrich's vehicle, and Troopers Frye and Fellin were both seated in Trooper Frye's vehicle, and were monitoring the conversation in Trooper Henrich's vehicle by scanner, when they heard Trooper Henrichs state the van would be searched.  Trooper Frye exited his patrol vehicle, went to Trooper Henrichs' vehicle, and asked the defendant where the personal use marijuana was located in the van.  The defendant stated it was near the passenger rear sliding door.  Trooper Frye told the defendant to exit the patrol vehicle and pat-searched the defendant.  Trooper Frye then approached the van, cupped his hands around his eyes, and peered through the back window.  He opened the tailgate and immediately saw green canvas bags containing blocks of marijuana wrapped in contact paper, and he smelled the odor of marijuana.  Contact paper wrapping does not stop marijuana odor from escaping, but it is often used to wrap marijuana bundles, especially those from the Arizona area.

Trooper Frye returned to the defendant, arrested him, and advised him of his Miranda rights.   The defendant stated he understood his rights.   Trooper Frye explained that the amount of marijuana found in the van would likely lead to federal charges, the officers knew the defendant was hauling the marijuana for someone else,

and the defendant would be given an opportunity to cooperate.  The defendant stated he was not willing to answer questions or cooperate and invoked his right to counsel. The defendant was not questioned thereafter and was transported to jail.

During the entire roadside encounter between the officers and the defendant, the officers maintained a professional tone and manner.  They made no promises or verbal threats, and exhibited no threatening behavior.  The defendant appeared to understand and was able to respond to the questions asked.  He is an adult, who speaks English, with a past history and therefore prior experience with the criminal justice system.

## LEGAL ANALYSIS

The defendant claims his vehicle was illegally searched while Trooper Henrichs was asking the defendant for his license and vehicle information, and was again illegally searched when the officer took off his hat and leaned toward the van window as the defendant was walking toward the patrol vehicle.  The defendant claims that on both occasions, Trooper Henrichs conducted an illegal search by sticking his head into the vehicle through the passenger window without probable cause or the defendant's consent.

Although a vehicle's interior "is not subject to the same expectations of privacy that exist with respect to one's home," the vehicle interior "as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police." New York v. Class, 475 U.S. 106, 114-115 (1986).   An officer's intrusion into that space is a "search."  Id.  Some courts have held that a search occurs when an officer sticks his head inside a vehicle's open window during a traffic stop.  See e.g., U.S. v. Ryles , 988 F.2d 13, 15 (5th Cir. 1993).

Trooper Henrichs did not, however, stick his head inside the defendant's vehicle when he first contacted the driver, and therefore no search occurred at that time.   While Trooper Henrichs was standing beside the defendant's vehicle and leaning toward the open passenger window to converse with the defendant, the officer did, however, smell marijuana.  He also noticed the defendant's hands were shaking as he handed over his driver's license.   Trooper Henrichs was conducting a legal traffic stop, and was lawfully located beside the defendant's vehicle and speaking to the defendant when the officer noticed the distinct odor of marijuana emanating from the van.

Trooper Henrichs again smelled marijuana in the vehicle when he took off his hat and placed his nose immediately next to the window opening while the defendant was walking toward the officer's vehicle.  The trooper did not stick his head through the window and therefore no "search" occurred.  However, even had such a "search" occurred, a warrantless search of vehicle is constitutional pursuant to the "automobile exception" to the warrant requirement if the law enforcement officer has probable cause to believe that vehicle contains contraband or other evidence of a crime before search began.   U.S. v. Wells, 347 F.3d 280 (8th Cir. 2003).  By the time Trooper Henrichs took off his hat and sniffed near the open window of the defendant's vehicle, the officer had already smelled marijuana in the vehicle and had probable cause to believe that evidence of illegal activity, in this case marijuana, was located in the defendant's van.  This probable cause justified any vehicle search conducted by the officer, including any act of sticking his head into the vehicle.  See e.g., U.S. v. Winters , 221 F.3d 1039, 1042 (8th Cir. 2000)(holding that where, during the course of a lawful traffic stop,  the defendant left the driver's side door of his vehicle open, and the trooper placed his head just inside and smelled raw marijuana, probable cause existed to search the car and its containers for drugs).

The defendant claims the officer's questioning in the patrol vehicle, particularly those questions asking why the officer could smell marijuana in the vehicle and if there was marijuana in the vehicle, violated the Fourth Amendment and Fifth

Amendment.  As to the Fourth Amendment claim, the defendant argues Trooper Henrichs was aware of the odor of marijuana coming from the vehicle as a result of the prior unlawful search of sticking his head in the vehicle windows.  The defendant argues the questions themselves arose from the prior illegal searches, and therefore the defendant's incriminating answers must be suppressed.  This claim is without merit.  Trooper Henrichs had not illegally searched the vehicle before asking the marijuana questions.

The defendant further claims that while he was questioned in the patrol vehicle, he was in custody, but was not advised of his Miranda rights before questioning. The defendant was not handcuffed while being questioned by Trooper Henrichs in the patrol vehicle. Trooper Henrichs' roadside questioning of the defendant during this routine traffic stop was not custodial interrogation for the purposes of Miranda, (Berkemer v. McCarty, 468 U.S. 420, 439 (1984); U.S. v. Morse, 2009 WL 1812093 (8th Cir. June 26, 2009)(holding a police officer conducting a traffic stop was not required to give Miranda warnings to the defendant before asking the defendant if he had drugs in his pocket)), and Miranda warnings were not required prior to questioning.

After the traffic stop was complete, the defendant was given a warning ticket, and his license was returned.  As the defendant was leaving the patrol vehicle, Trooper Henrichs asked the defendant if he was willing to answer additional questions.  The defendant agreed to do so without hesitation.  The defendant was not threatened or coerced, or promised anything to elicit his agreement to stay and answer questions. Trooper Henrichs' continued questioning, after the traffic stop, was consensual and not custodial.  This post-traffic stop questioning did not violate defendant's Fourth or Fifth Amendment rights.  United States v. Flores, 474 F.3d 1100, 1103-04 (8th Cir. 2007).

To summarize, Trooper Henrichs did not illegally search the defendant's van by sticking his head into the passenger window, either upon initial contact with the defendant or when the officer later removed his hat; the defendant was not in custody for <u>Miranda</u> purposes while being questioned by Trooper Henrichs at the scene and prior to his formal arrest, and his Fifth Amendment rights were not violated; and any questioning conducted after the traffic stop was complete was consensual and not the product of an unlawful, coercive detention in violation of the Fourth Amendment.

By the time the tailgate of the defendant's van was opened by Trooper Frye, Trooper Henrichs had smelled marijuana in the defendant's van; the officer had noticed the defendant was shaking, sweating, and the pulse of his carotid artery was visible; the officer knew the defendant had lied about his past arrest history for drug-related crimes; the defendant claimed to have skied at Powderhorn, near Durango, although the officer knew this resort was actually located near Grand Junction, Colorado; the officer observed the defendant had no sunburn indicative of skiing for three days in the mountains; the defendant was wearing an NYPD t-shirt, a act consistent with trying to appear pro-law enforcement; Trooper Henrichs saw what appeared to be boxes which were, for no apparent reason, covered by a blanket in the rear cargo area of the van; and, most importantly, the defendant admitted there was marijuana, albeit only a personal use amount, in the van.  The officers had ample facts supporting probable cause to search the defendant's van.  See e.g., <u>U.S. v. Davis, 2009 WL 1885254, 3 (8th Cir. July 2, 2009)</u>("If there had been any doubt about whether the smell of smoldering cannabis constituted probable cause to search the vehicle, such doubt was obviated by the discovery of a bag of marijuana in Davis's pocket.");  <u>U.S. v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006)</u>(holding the search of the passenger compartment of a pickup was supported by probable cause where officers observed packages wrapped in cellophane and detected the odor of masking agents commonly used to obscure the smell of narcotics);  <u>U.S. v. Bradford, 423 F.3d 1149, 1159 (10th Cir. 2005)</u>( holding a reasonable officer would think that a suspect might confess to a small amount of drugs in order to avoid further

investigation, and this fact, coupled with the defendant's nervousness and evasiveness, established probable cause to search the vehicle).

The defendant's motion to suppress evidence found during the search of defendant's van, and the statements defendant made during the roadside encounter of January 7, 2008, will not be suppressed.  Accordingly,

IT IS ORDERED that defendant's motion to suppress, (filing no. 23), is denied.

DATED this 8th day of July, 2009.

BY THE COURT:

*s/Richard G. Kopf*
United States District Judge